THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANKIE N. WALKER, ) | |
| ) | |
| *Plaintiff*, ) | No. 22 C 03004 |
| v. ) | |
| ) | Chief Judge Virginia M. Kendall |
| JOHN P. ROE, ) | |
| ) | |
| *Defendant*. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Frankie N. Walker was previously adjudicated a sexually violent person under the Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1–99, and was on conditional release at the time he filed this 42 U.S.C. § 1983 lawsuit. (Dkt. 1 ¶ 2). Walker, originally proceeding *pro se*, brought Constitutional and state law claims against the Illinois Department of Human Services, Liberty Health Care, and various individuals stemming from the conditions and administration of his release. (Dkt. 1 at 1). Consistent with 28 U.S.C. § 1915(e)(2)(B), two U.S. District Judges conducted Merit Reviews of Walker's Complaint, (Dkt. 1), and First Amended Complaint, (Dkt. 5). (*See* Dkt. 4; Dkt. 12). As a result of those Merit Reviews and subsequent orders of the Court, all of Walker's claims were dismissed except one against John P. Roe, his Conditional Release Agent. (Dkt. 12 at 3–4; *see* Dkt. 20). That claim alleges Roe violated the Fourteenth Amendment by failing to provide Walker with access to "medical transportation." (*See* Dkt. 12 at 3). Walker was subsequently appointed counsel and filed a Second Amended Complaint. (Dkt. 29; Dkt. 68). Roe now moves for Summary Judgment, and Walker cross-moves for Summary Judgment. (Dkt. 79; Dkt. 88). For the following reasons, Roe's Motion for Summary Judgment [79] is granted; Walker's Cross Motion for Summary Judgment [88] is denied.

1

**BACKGROUND**

The following facts are undisputed unless otherwise noted. Plaintiff Frankie N. Walker, at all relevant times to this case, was on conditional release pursuant to the Illinois Sexually Violent Persons Commitment Act, 725 ILCS 207/1–99. (Ex. M, Dkt. 80-1 at 109).[1] Nonparty Liberty Healthcare ("Liberty Health") is a private company that operates the Illinois Conditional Release Program. (Dkt. 81 ¶ 2). John P. Roe worked for Liberty Health and was Walker's Conditional Release Agent, meaning he supervised Walker and ensured he complied with the terms of his release. (*Id.* ¶ 13; Ex. N, Dkt. 80-1 at 21–22). These terms required Walker to stay at his home unless Roe was accompanying him; Roe also had to approve all of Walker's requested medical appointments. (Dkt. 81 ¶¶ 14–15, 29).

In March 2020, the COVID-19 pandemic began to ravage the United States. On March 16, 2020, Liberty Health developed an Infectious Disease Preparedness Response Plan ("Response Plan"), which informed how the company and its agents would handle non-work-related movement and activities for individuals on conditional release. (*Id.* ¶¶ 18–19; Ex. B, Dkt. 80-1 at 13–15). The Response Plan directed agents to ensure clients had medication, food, and supplies to last them a minimum of two weeks. (Ex. B, Dkt. 80-1 at 13). It further instructed agents to transports clients to and from the grocery store, but to otherwise minimize all contact with the public. (Ex. B, Dkt. 80-1 at 14). Clients with health concerns requiring immediate attention were directed to notify their agent or contact 911 in case of emergency. (Ex. B, Dkt. 80-1 at 15).

As the pandemic escalated, Liberty Health and its then-executive director Steve Bryant,

---

[1] The Court overrules Walker's relevancy and Fed. R. Evid. 403 objections to references to his status as a sexually violent person. (*See* Dkt. 86 ¶¶ 9–12). His history and conditional release status is relevant as it informs the appropriate standard and Constitutional Amendment that governs his case. Objections to undue prejudice are unnecessary at summary judgment because there is no jury to be misled or unfairly prejudiced. *See, e.g.*, *Holt v. Noble House Hotels & Resort, Ltd.*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019).

extended the Response Plan's guidance several times. (Dkt. 81 ¶¶ 23–25). These events coincided with Illinois Governor J.B. Pritzker's orders declaring all counties in the state "disaster areas." (*Id.* ¶ 25; Ex. A, Dkt. 80-1 at 1–2). In May and June of 2020, when the events giving rise to Walker's claim took place, Liberty Health's leadership continued to instruct agents to eliminate all non-essential movement for individuals on conditional release. (Ex. L, Dkt. 80-1 at 97; Dkt. 81 ¶ 25).

Walker began experiencing chest pain sometime in May 2020. (Dkt. 87 ¶ 1). At this point, he controlled whether and when to contact his various medical providers. (Dkt. 81 ¶ 28). But he needed Roe's approval before scheduling an in-person appointment and needed Roe to transport him to any confirmed visits. (*Id.* ¶¶ 27, 29). On May 27, 2020, Walker had a telehealth appointment with the Howard Brown Health Clinic ("Howard Brown Health"). (*Id.* ¶ 31). He reported that he was experiencing chest pain, but denied having any other symptoms that could indicate a health emergency. (*Id.* ¶ 32). The care provider with whom Walker spoke told him to come into the clinic in two to three days for an electrocardiogram ("EKG"), which had been ordered, and that he should go to the emergency room if his chest pain worsened. (*Id.* ¶ 34).

Walker next spoke with Howard Brown Health via phone on June 8, 2020. (*Id.* ¶ 37). During that conversation, he confirmed that he was still experiencing chest pain but that it had not worsened and that he was still not experiencing any other symptoms. (*Id.*) He told his care provider that he was going to call back to get an in-person EKG on the calendar, but that he needed to check his schedule first. (*Id.* ¶ 41). At no point during either of Walker's conversations with Howard Brown Health did a care provider instruct him to report to the emergency room or seek immediate medical attention. (*Id.* ¶¶ 36, 42).

While the parties present marginally different views of what conversations took place, and when, between Roe and Walker, it is undisputed that the two of them were in frequent contact and

3

had more than one discussion about Walker's ongoing chest pain. (Dkt. 81 ¶ 44; Dkt. 87 ¶¶ 4, 7). It is also undisputed that Roe reached out to one of his Liberty Health supervisors—Steve Glazier, who was then the Deputy Chief of the company—for his guidance on Walker's referral for a stress test or EKG. (Ex. L, Dkt. 80-1 at 97; Dkt. 81 ¶ 38). Glazier informed Roe that, consistent with the company's COVID-19 Response Plan, Walker would need to wait until pandemic restrictions were lifted to schedule an in-person appointment unless advised that his referral was an emergency. (Ex. L, Dkt. 80-1 at 97; Dkt. 81 ¶ 40). Roe relayed this information to Walker, effectively denying his requests for a more immediate medical appointment with Howard Brown Health—walk-in, scheduled, or otherwise. (Dkt. 81 ¶ 45; Dkt. 97 ¶ 8). Walker admits that Roe told him that he could always call 911 if he thought he was having a health emergency. (Ex. G, Dkt. 80-1 at 29; Ex. L, Dkt. 80-1 at 97; Dkt. 81 ¶ 45).

Evidently, on June 17, 2020, Walker determined his chest pains required emergency treatment. He called 911 at 8:00 p.m. and was transported to St. Bernard Hospital. (Dkt. 81 ¶ 46–47; Dkt. 87 ¶ 24). At St. Bernard, Walker underwent an EKG, an x-ray, and lab work, the results of which all came back normal. (Ex. I, Dkt. 80-1 at 37–38, 40; Dkt. 81 ¶¶ 47–49). He also had a stress test, which came back abnormal. (Ex. I, Dkt. 80-1 at 44–45). St. Bernard initiated a nonemergency transfer for Walker to Mt. Sinai Hospital on June 21, 2020, where he had a full cardiac work-up. (*Id.* at 55; Dkt. 81 ¶ 51). Walker was discharged on June 23, 2020 with diagnoses of unspecified chest pain and hyperlipidemia. (Dkt. 81 ¶ 52).

Walker filed his initial *pro se* complaint in this case on June 8, 2022.[2] (Dkt. 1). Eventually, the Court recruited counsel to represent Walker, and he filed a Second Amended Complaint on December 11, 2023. (Dkt. 30; Dkt. 68).

---

[2] Walker repeatedly objects to the relevance of statements he made in his initial complaint. (*See* Dkt. 86 ¶¶ 54–61). The Court finds Walker's *pro se* complaints and the factual allegations therein of no consequence to the resolution of

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact "exists only if 'there is sufficient evidence' " for a reasonable jury to return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. In evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the nonmoving party's favor. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The Court's primary role in ruling on summary judgment is to determine whether there are any genuine issues for trial, not to "evaluate the weight of the evidence or to determine the truth of the matter." *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. New World Holdings, LLC*, 2012 WL 983790, at *2 (N.D. Ill. Mar. 21, 2012) (quoting *Doe v. R.R Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994)).

## DISCUSSION

Walker is on conditional release as a previously adjudicated sexually violent person. 725 ILCS 207/1–99. He is thus not a "prisoner" as defined in the Prison Litigation Reform Act, 28 U.S.C. § 1915(h). Walker's inadequate medical care claim against Roe is "derived from the Fourteenth Amendment's guarantee of due process, not the Eighth Amendment's right to be free

---

the instant Motions for Summary Judgment and does not rely on them in its decision. Nonetheless, the objection is overruled as an evidentiary matter because factual allegations in a superseded complaint are party admissions that can go to credibility. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 640 (7th Cir. 2004). The Court also notes that relevancy objections are unnecessary because one of the purposes of summary judgment itself is for the Court to determine what facts are material to the outcome of a case.

from cruel and unusual punishment." *Smego v. Jumper*, 707 F. App'x 411, 412 (7th Cir. 2017); *see also Hughes v. Farris*, 809 F.3d 330, 334–35 (7th Cir. 2015).

A plaintiff alleging inadequate medical care under the Fourteenth Amendment must demonstrate two things:

> First, he must show that the defendants acted purposefully, knowingly, or recklessly. A showing of only negligence or even gross negligence will not suffice to meet this standard. Second, he must proffer evidence showing that the course of treatment he received was objectively unreasonable. This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided medical care and to gauge objectively - without regard to any subjective belief held by the individual - whether the response was reasonable.

*Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020) (internal citations and quotations omitted). A more threshold showing is required as well—whether the plaintiff suffered from "an objectively serious medical condition." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). Put differently, there are really three elements to an inadequate care claim: (1) an objectively serious medical need; (2) volitional acts or omissions on the part of the defendant concerning the medical need; and (3) a response from the defendant that was "objectively unreasonable." *Miranda v. County of Lake*, 900 F.3d 335, 352–54 (7th Cir. 2018); *see also Pittman ex rel. Hamilton v. Madison Cnty., Ill.*, 108 F.4th 561, 571–72 (7th Cir. 2024), *reh'g denied*, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied sub nom. Pittman v. Madison Cnty., Ill.*, 2025 WL 299586 (U.S. Jan. 27, 2025).

### I. Objectively Serious Medical Condition

Roe first contends that summary judgment is appropriate because Walker failed to establish that he suffered from an objectively serious medical condition. (Dkt. 80 at 9–10). An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Severe heartburn, frequent vomiting, hernias,

and chronic pain represent some of the conditions that courts have found to constitute objectively serious conditions. *Id.* (heartburn and vomiting); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011) (hernias and chronic pain). At the same time, courts have construed "breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy" as "relatively minor." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999). What is clear from the case law is that symptoms and conditions are not categorically serious or minor. What counts are the facts and circumstances surrounding those symptoms or conditions. Taken as a whole, the Court must determine whether a particular set of circumstances was sufficiently serious as to require medical care or attention, from an objective perspective. *Henderson*, 196 F.3d at 846.

The undisputed facts demonstrate that Walker's chest pains were objectively serious and called for medical attention. Walker was not suffering from a case of the "sniffles or minor aches and pains or a tiny scratch or a mild headache or mild fatigue." *Zentmyer v. Kendall Cnty., Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). He had chest pains that led him to consult with a health clinic on two occasions over a thirteen-day period. (Dkt. 81 ¶¶ 31–32, 37). And his health care providers—while concluding that Walker was not experiencing an emergency that required immediate attention—did think his symptoms were serious enough to call for an EKG and blood labs. (Dkt. 81 ¶ 34). Just because Walker's care providers did not tell him his chest pain was a medical emergency does not mean they were unserious. There are innumerable conditions or circumstances that call for medical treatment and qualify as objectively serious without necessitating an immediate visit to the emergency department. Summary judgment is not appropriate on this element.

## II. Volitional Acts

The parties do not devote much time or attention to the "volitional act" element of Walker's claim. This is not entirely surprising given the caselaw on what plaintiffs must prove in an inadequate care case has rapidly evolved, as recently as three days before Roe moved for summary judgment. *See Pittman*, 108 F.4th 561 (decided July 16, 2024); (Dkt. 79 (filed July 19, 2024)). In any event, the element is straightforward. The framing strictly considers whether the defendant "intended to commit the physical act that caused the alleged injury." *Pittman*, 108 F.4th at 570. Or perhaps more relevant to this case, whether the defendant made "an intentional decision about the plaintiff's" medical care. *Id.* at 571. Thus, Walker must only establish that Roe did or did not do *something*, in either physical or decisional terms, in response to his chest pain. *See, e.g.*, *Thomas v. Booth*, 2024 WL 4027919, at *5 (N.D. Ill. Sept. 3, 2024) (observing that a plaintiff asserting a Fourteenth Amendment claim must show that the defendant "intended to carry out a certain course of actions").

There is no question that Roe made decisions and took actions with respect to Walker's condition that form the basis of this case. For example, Roe had a conversation with Steve Glazier, Deputy Chief of Liberty Health about Walker's medical referral for a stress test. (Dkt. 80 ¶ 38–39). After that conversation, Roe told Walker that he could not schedule or otherwise attend an in-person appointment at Howard Brown Health unless his medical providers advised him that his condition was an emergency. (Dkt. 80 ¶¶ 40, 44–45). These volitional acts easily satisfy the second element of Walker's inadequate care claim, leaving only an analysis of whether what Roe did was objectively unreasonable.

### III. Objective Unreasonableness

The final step of the inquiry requires Walker to demonstrate that Roe's actions, in context, were objectively unreasonable. But as a preliminary matter, the parties devote a significant portion of their briefs to whether this is even the correct standard. Specifically, Roe contends that the "professional judgment standard" from *Youngberg v. Romeo* should guide the Court's assessment of his actions. 457 U.S. 307, 322–23 (1982); (Dkt. 80 at 5; Dkt. 98 at 9).

The professional judgment standard directs courts to presume a professional's decisions were valid and only find constitutional violations in cases when those decisions were a "substantial departure from accepted professional judgment, practice, or standards in the care and treatment of [a plaintiff]." *Youngberg*, 457 U.S. at 314. Roe contends that the professional judgment standard applies when a Plaintiff "alleges denial of medical treatment by a non-medical professional." (Dkt. 80 at 5). He has the principle completely backward. *Youngberg* establishes that the professional judgment standard applies when analyzing care decisions made by *qualified medical professionals* because balancing questions should not be left to the "unguided discretion of a judge or jury." 457 U.S. at 321; *see Johnson v. Rimmer*, 936 F.3d 695, 707 n.42 (7th Cir. 2019) (observing the professional judgment standard applies to a Fourteenth Amendment inadequate care claim when there has been a professional treatment decision, i.e., one made by someone with "a degree in medicine or nursing"). The professional judgment standard has no application to cases like Walker's, where it is undisputed that the defendant is not a medical professional and had no medical training. (Dkt. 87 ¶ 10). Indeed, many if not most Fourteenth Amendment inadequate care cases challenge nonmedical professional's (e.g., correctional officers') conduct under the objective reasonableness standard. *See, e.g.*, *Cullum v. Wondrasek*, 2024 WL 4347141 (N.D. Ill. Sept. 30, 2024) (Kendall, C.J.). The ordinary objective reasonableness standard applies here.

9

Whether a defendant's conduct was objectively unreasonable depends on the "totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care." *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). Critically, the inquiry does not consider a defendant's "*subjective* views about risk of harm and necessity of treatment." *Pittman*, 108 F.4th at 570 (emphasis in original). The "essential objective inquiry" in this case is whether a reasonable person under the same circumstances as Roe would have recognized the severity of the situation and need for medical care and acted differently. *Pittman*, 108 F.4th at 570, 572; *see Redman v. Downs*, 854 F. App'x 736, 738 (7th Cir. 2021) (considering whether a defendant "purposefully, knowingly, or recklessly created conditions that were objectively unreasonable"); *see also Dopson v. Corcoran*, 2025 WL 71737, at *6 (N.D. Ill. Jan. 8, 2025) (discussing how the *Pittman* decision "untangled a knot of cases," clarifying the objective inquiry for Fourteenth Amendment inadequate medical care cases).

The undisputed facts show that Roe acted reasonably in responding to Walker's needs and charting a course with respect to his care. When the COVID-19 pandemic began in March 2020, Liberty Health developed a comprehensive action plan that included detailed guidelines surrounding whether and under what circumstances individuals on conditional release could seek or otherwise attend medical appointments. (Dkt. 81 ¶¶ 18–19; Ex. B, Dkt. 80-1 at 13–15). That guidance instructed agents like Roe to temporarily halt all clients' nonemergency medical appointments. (Dkt. 81 ¶ 20). When Governor Pritzker extended statewide disaster declarations at the end of April and end of May, Liberty Health likewise extended its Response Plan. (Dkt. 81 ¶ 23). While Liberty Health is not a party to the case, its directives were considered and consistent with prevailing pandemic response approaches. Roe reasonably relied upon them in telling Walker that his in-person appointments would have to wait. Faced with a once-in-a-century pandemic,

10

Liberty Health's policies, which Roe followed, factored in that the pandemic had hit hospitals and health clinics the hardest and, as a result, were under immense stress and demand.[3] Limitations on nonemergency appointments during this time therefore considered the health and safety of Liberty Health's staff and clients, as well as the broader community. (Ex. B, Dkt. 80-1 at 13–15). These facts on the ground are especially important here, considering the novel difficulties COVID-19 created. The Court's objective analysis of Roe's conduct recognizes those difficulties and considers his actions without "the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

To the extent there are minor factual disputes surrounding whether Walker had or needed a pre-planned appointment for his EKG and labs, or whether Roe simply declined to present him for a walk-in, they are immaterial to the outcome of the case. (*See* Dkt. 80 at 6–7; Dkt. 90 at 6). The record makes clear that Roe would have responded the same way regardless—i.e., he would have relied on his company's guidance, informed by state and national health policy, in telling Walker that any non-emergency visits would have to wait until restrictions lifted. This same reasoning applies to Walker's arguments that his proximity to Howard Brown Health while shopping for groceries somehow undercuts the reasonableness of Roe's conduct, in that these facts are immaterial to the conduct at issue or outcome of the case. (*See* Dkt. 90 at 2, 7). Roe taking Walker to buy life-sustaining food and supplies—consistent with Liberty Health's Response Plan—has no real bearing on the reasonableness of his decision to decline Roe's non-emergency medical appointment. (Ex. B, Dkt. 80-1 at 13). Shopping for food and attending an in-person health appointment during the height of a pandemic are very different things.

---

[3] Walker's reliance on Governor Pritzker's executive order, which permitted limited access to gym, salons, and similar facilities, fails to account for these unique circumstances health providers, clinics, and hospitals faced during the pandemic. (*See* Dkt. 90 at 4, 10).

Importantly, Roe's approach did not foreclose Walker's access to medical care. If Walker's care provider had told him that he needed to seek care right away, Liberty Health and Roe would have allowed Walker to schedule an appointment. (Dkt. 40 ¶ 40 (undisputed fact indicating Glazier told Roe that Walker's appointments would have to wait "unless Mr. Walker's medical providers told him the referral was emergent")). Walker was in frequent communication with Howard Brown Health and his providers regularly asked about his specific symptoms. (Dkt. 80 ¶¶ 32, 37). They never told him that he needed to come to the clinic right away, go to an emergency room, or call an ambulance. (Dkt. 80 ¶¶ 36, 42). While it is true that Howard Brown Health advised Walker to come in for an EKG two to three days after his May 27, 2020 appointment, (Dkt. 81 ¶ 35), this advice does not render all other care plans objectively unreasonable. *Cf. Summer v. Standiford*, 2022 WL 3908673, at *5 (N.D. Ill. Aug. 30, 2022) (Kendall, J.) (observing that correctional officers have "latitude in applying outside recommendations in light of the unique challenges and policies only present in a correctional setting"); *see also Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Roe considered Howard Brown Health's recommendation, consulted with his supervisors, and ultimately acted considering the unique challenges that Walker's conditional release status and the COVID-19 pandemic posed.

Additionally, Walker was under consistent advisement from both Roe and his health care providers that he should call 911 if he needed immediate care. Walker did not determine that was necessary between his first and second appointments with Howard Brown Health; to the contrary, it is undisputed that he told his care providers on June 8 that he had "no new onset or worsening of chest pains." (Dkt. 80 ¶ 37). As soon as Walker felt his health issues reached the point of emergency, he followed the guidance Roe gave him, called 911, and received immediate care. (Dkt. 80 ¶¶ 46–47).

It is regrettable that Walker ultimately had to call 911 to address his chest pain. Roe's actions leading up to that point, however, must be taken in context. Roe was in frequent communication with both Walker and his supervisors about Walker's medical referral. His decision to limit Walker's in-person care to emergency-only situations during the height of the pandemic was not objectively unreasonable. Walker clearly disagrees with the course of treatment he received, or rather, was denied in May and June of 2020. But this disagreement does not render Roe's actions unreasonable. *Williams*, 937 F.3d at 944 (recognizing disagreements over care decisions do not control the reasonableness analysis); *see also Thomas v. Booth*, 2024 WL 4027919, at *6 (N.D. Ill. Sept. 3, 2024) (same).

Walker has failed to demonstrate a genuine issue of material fact regarding whether Roe's response to Walker's chest pain was objectively unreasonable. Because the Court concludes, as a matter of law, that Roe's actions were reasonable, he is entitled to summary judgment. The Court declines to consider the parties' remaining arguments, including Roe's immunity-based defenses.

## CONCLUSION

For the foregoing reasons, the Court grants Roe's Motion for Summary Judgment [79] and denies Walker's Cross Motion for Summary Judgment [88].

_____
Virginia M. Kendall
United States District Judge

Date: March 24, 2025